UNITED STATES OF AMERICA,

    Plaintiff,

v.

JOHNATHAN ERIC THOMPSON,

    Defendant.

**GOVERNMENT'S POSITION REGARDING SENTENCING**

The United States by its attorneys, Lisa D. Kirkpatrick, Acting United States Attorney for the District of Minnesota, and Nichole J. Carter, Assistant United States Attorney, hereby submits its Position Regarding Sentencing in the above-entitled matter.

### 1. SENTENCING METHODOLOGY AND GUIDELINES

In *Gall v. United States*, the Supreme Court set forth the appropriate sentencing methodology. 552 U.S. 38, 49–50 (2007). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Id.* at 49. "[U]nder the advisory guidelines scheme, sentencing judges are required to find sentence-enhancing facts only by a preponderance of the evidence." *United States v. Scott*, 448 F.3d 1040, 1043 (8th Cir. 2006). In addition, a district court must assess the other applicable sentencing factors under Section 3553(a). Those factors include the nature and

circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; the need to avoid unwarranted sentencing disparities; and the need to provide restitution to victims. 18 U.S.C. § 3553(a).

A. **Base Offense Level.**

United States is aware that the Presentence Investigation Report (hereafter "PSR") found the base offense level to be 34 due to the weight of the controlled substances at issue in this case. (PSR ¶ 21). This fact was known to the parties at the time of the plea. The government recommends the Court find that the base offense level is 34.

B. **Specific Offense Characteristics.**

The government concurs with the PSR that the base offense level be increased by 2 levels because the Defendant maintained a premises for the purposes of distributing controlled substances. (PSR ¶ 23)

The government is aware that the PSR found a 2-level increase was warranted for possession of a dangerous weapon. (PSR ¶ 22) Reasonable minds can differ on whether the facts support such an enhancement. However, the government agreed that this adjustment was not applicable and will abide by its plea agreement.

The government also concurs with the PSR that the investigative materials do not provide a sufficient indication that the defendant imported controlled substances and that this enhancement should not apply. (PSR ¶ 24)

2. **CHAPTER 3 ADJUSTMENTS.**

The government has chosen not to pursue the 2-level enhancement for the leadership role in this matter, given that the government is recommending a sentence of 240 months.

3. **ACCEPTANCE OF RESPONSIBILITY.**

The government will recommend a 3-level reduction for acceptance of responsibility reducing the offense level to 33.

4. **CRIMINAL HISTORY.**

The government agrees with the PSR that the Defendant falls within Criminal History Category VI. (PSR ¶ 49) This was contemplated by the parties at the time of the plea.

5. **APPLICABLE GUIDELINE RANGE.**

With a total offense level of 33 and a criminal history category of VI, the guidelines recommend a range of 235-293.

6. **SENTENCING FACTORS.**

Under 18 U.S.C. § 3553(a), when determining the ultimate sentence, the Court looks to the nature and circumstances of the offense; the history and characteristics of the Defendant; the seriousness of the offense; the need to

promote respect for the law; the need to provide adequate deterrence and protection of the public; providing the Defendant with needed educational training, vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences available; and the applicable guideline sentencing range. 18 U.S.C. § 3553(a).

After calculating a defendant's advisory Sentencing Guidelines range and hearing from the parties, the district court must consider the sentencing factors set forth in 18 U.S.C. § 3553(a) and make an individualized assessment based on the facts in arriving at an appropriate sentence. *Gall*, 552 U.S. at 49–50; *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors."). Section 3553(a) requires the Court to analyze several factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities."

For the reasons discussed below, consideration of these factors supports a sentence of 240 months' imprisonment. Such a sentence accounts for both

4

the aggravating and mitigating factors present in this case, and is sufficient, but not greater than necessary, to serve the purposes of sentencing.

### A. The Nature of the Offense.

Beginning in the fall of 2022, the Lake Superior Violent Offender Task Force (LSVOTF) began to receive information that a person named "Remy" was selling heroin in the Duluth area. Through investigation, officers discovered that "Remy" was the Defendant. They further learned that the Defendant was selling controlled substances with his co-defendant and co-conspirator, Bruce Thompson, also known as "Wolf." Through search warrants executed in August and October 2023, officers recovered approximately five pounds of methamphetamine that was directly attributed to be sourced from the Defendant.

Officers executed pen register/trap and trace search warrants as well as geolocation search warrants on the phone numbers suspected to belong to "Remy" and "Wolf." The warrants revealed that their phones often traveled from Duluth to Chicago and then back to Duluth.

### *Controlled Purchase of 1,820 grams of methamphetamine*

On October 27, 2023, officers used a confidential informant to contact the Defendant to purchase methamphetamine. The informant initially reached out to the Defendant to arrange for the purchase of four pounds of methamphetamine. However, his phone was turned off. The informant then

5

contacted Bruce Thompson who stated that the Defendant was out of town (which was confirmed by the PRTT warrant data), but that he could get the informant what he was asking for. Shortly after, the informant was contacted by the Defendant who informed the informant that he was out of town, but that "Wolf" could take care of him.

Officers then saw Bruce Thompson leave 2906 West 3rd Street, Duluth and travel to the location where he told the informant to meet him. As Bruce Thompson was leaving 2906 West 3rd Street, the residence that was used by the drug trafficking organization as a stash house, he was observed carrying a backpack, which he gave to the informant during the controlled purchase. Inside the backpack was a substance that field tested positive for methamphetamine and that had a field weight of 1,830 grams.

On October 31, 2023, LSVOTF, through PRTT data, officers saw that the phone attributed to the Defendant left Chicago and traveled to Duluth. Later that afternoon, the Defendant was seen driving around the city of Duluth, meeting with persons who are known to the LSVOTF as being involved in the drug trade.

On November 3, 2023, the Defendant reached out to the informant and asked if he wanted to buy five pounds of methamphetamine. The Defendant contacted the informant again on November 14, 2023 and asked him if he wanted to buy methamphetamine.

### *Controlled Purchase of 2,280 grams of methamphetamine*

On November 16, 2023 the informant completed a controlled buy of methamphetamine from the Defendant. Prior to the sale, LSVOTF officers saw the Defendant and Bruce Thompson leave the stash house at 2906 West 3rd Street with a grey backpack. The two men drove a white Tahoe to meet the informant. The Defendant carried the grey backpack to the informant's vehicle. The informant provided the Defendant a paper bag containing $16,000.00. In return, the Defendant provided the informant a substance that field tested positive for methamphetamine and that had a field weight of 2,280.

### *Search Warrants Executed on November 30, 2023*

On November 30, 2023, LSVOTF officers obtained state search warrants for the persons of Johnathan, Bruce and Eric Thompson, the residence that they stayed at (30 North 24th Avenue West, Duluth), the stash house (2906 West 3rd Street, Duluth), a white Jeep that Eric Thompson was seen driving, and the Tahoe that Bruce Thompson was seen driving.

On November 30, 2023, during pre-search warrant surveillance, LSVOTF officers saw the Defendant get off a Groome Transport shuttle and walk toward the Jeep Grand Cherokee driven by Eric Thompson. LSVOTF investigators moved towards the Defendant and the Jeep to detain the Defendant. LSVOTF officers gave clear directions for the Defendant to stop, however, the Defendant refused and began to flee law enforcement. The

Defendant fled northbound. During the pursuit, he discarded the black backpack that he had been carrying when he left the transport van. The Defendant was eventually detained. In the bag that he discarded, officers found 268 grams of pressed fentanyl and 100 "M30" fentanyl pills.

LSVOTF officers located Bruce Thompson as he was leaving 2906 West 3rd Street, just as officers where they were executing a state search warrant. Pursuant to the state search warrant, officers searched him and found a small bindle of grey powder in his pocket which tested positive for fentanyl.

During a search of 2906 West 3rd Street investigators seized multiple items indicative of drug trafficking activity from various locations inside the residence: Inside a closet officers located a .22 caliber Ruger handgun along with two handgun holsters and multiple handgun magazines and rounds of ammunition. A bus ticket and receipt with Bruce Thompson's name was found near the gun. This is noteworthy as during this investigation, other persons cooperating with the LSVOTF reported to officers that Bruce would carry a handgun with him. Methamphetamine and fentanyl were found throughout the residence.

In the kitchen upper cabinet, officers located two plastic bags which both contained suspected controlled substances. In the ceiling of the kitchen, officers located a plastic vacuum sealed bag that contained suspected

controlled substances. On top of the refrigerator was a gummy bear bag that contained a large amount of plastic baggies containing different colored powders, which were also suspected to be controlled substances. A large baggie of fentanyl was found in a cabinet next to the refrigerator. Inside that same cabinet officers also located a silver twist top press, valve masks (commonly used when processing fentanyl), and a bullet blender containing a grey powdery substance suspected to be fentanyl. They also discovered a metal pill press and two scales. It appeared that the kitchen area was the main area that was used to process controlled substances for sale. Additionally, $2,700 USD in cash was found in the residence. In total, inside this residence, officers found 858 grams of methamphetamine and 568 grams of fentanyl.

During the search of 30 North 24th Avenue, Duluth, Minnesota, investigators seized four scales which tested positive for methamphetamines and fentanyl, a Ruger handgun, a Khar handgun, and a Taurus handgun, along with a variety of ammunition (9mm, .45, and .22). A black duffle bag that contained indicia related to Jonathan was also seized. A total of $6,778 in United States currency was also seized from this location as part of proceeds from the sale of controlled substances. One of the two women believed to live at the residence, claimed that she owned the firearms that were recovered, and ATF traces confirmed this.

### B. The History and Characteristics of the Defendant.

The Defendant has a significant criminal history that consists of repeated drug sale convictions. He began his criminal career as an adolescent in Chicago, Illinois. At just 17 he was charged with Mob Action, Failure to Withdraw as he was involved in a large gang fight. (PSR ¶ 35) Witnesses reported that the Defendant was kicking and punching others and throwing males to the ground. *Id*. This offense was stricken with leave to reinstate. *Id*.

He went on to commit his first drug offense at age 23 and was convicted of Manufacture/Deliver Controlled Substances in Cook County, Illinois. (PSR ¶ 39) In matter, in March 2013, he sold 0.8 grams of heroin to an undercover officer and was in possession of $1,855 in cash and an additional 4.8 grams of heroin that was packaged for sale. *Id*. He received a sentence of two years' probation yet violated probation three months after he was sentenced and was ultimately ordered to serve 336 days in jail. *Id*. His probation violation appears to come about due to an arrest for a drug possession offense. *Id*.

In March 2014, seemingly while the 2013 case referenced above was pending, the Defendant was again charged with Manufacture/Delivery of Controlled Substances in Cook County, Illinois. (PSR ¶ 40) The complaint in that matter indicates that the Defendant was engaging in hand to hand drug sales and that at the time of his arrest he was in possession of one gram of heroin that was packed in four small baggies, ready for sale, as well as $4,248
10

in cash. *Id*. He was sentenced to three years' probation, but probation was revoked and he served three years in the Illinois Department of Corrections for this offense. *Id*.

In October 2014, the Defendant was again charged with Manufacture/Deliver Controlled Substances in Cook County, Illinois. In that offense, he was in possession of 7.2 grams of heroin that were packed in multiple baggies, ready for sale. (PSR ¶ 41) He was initially placed on two years' probation for this offense, but that probation was violated for due to a new drug possession arrest. *Id*.

In May 2015, the Defendant was charged with Possession of a Controlled Substance in Cook County, Illinois. In that matter, he was in possession of 0.6 grams of heroin. (PSR ¶ 42) He was ultimately sentenced to serve one year in prison. *Id*.

Despite probationary intervention and ultimately prison sentences, the Defendant again went on to commit additional drug sale offenses.

In March 2017, the Defendant sold 0.24 grams of heroin to an undercover officer in Grand Haven, Michigan. (PSR ¶ 45) He also delivered heroin to an undercover officer approximately one week later. *Id*. A warrant was issued in Michigan for the Defendant's arrest in 2017, and he was subsequently arrested on that warrant in 2021.

In January 2019, the Defendant had 94 grams of cocaine inside a backpack that contained receipts that had his name on them. (PSR ¶ 43) This offense occurred in Washburn County, Wisconsin. *Id*. He was sentenced to serve 18 months in prison and was placed on parole for two years. *Id*. He was discharged from this sentence in 2022. *Id*.

However, while this case was pending, the Defendant was charged with Third Degree Controlled Substance Sale, in January 2019 in St. Louis County, Minnesota. (PSR ¶ 44). In that matter, the Defendant in possession of 14.63 grams of fentanyl, 2.29 grams of cocaine, plastic baggies, a scale and a drug cutting agent. *Id*. The Defendant was sentenced to serve 45 months in prison and was discharged from that sentence in November 2023. *Id*.

During the time that the Defendant was on supervised release for this Minnesota conviction, he was engaging in the drug sales that lead to the offense before the Court. He has repeatedly demonstrated that pattern over the course of his criminal career. Neither a prison sentence, nor probationary supervision has deterred the Defendant from selling drugs. In fact, as time has gone on, he's gone on to sell higher quantities of drugs. He must somehow be deterred from continuing this criminal behavior. A sentence of 240-months would accomplish that goal and serve to protect the community from the Defendant's actions.

### C. Deterrence, Need to Protect the Public and Benefits of Incarceration.

As set forth above, the Defendant's history and characteristics show he has been on a dangerous path of drug trafficking for the past eleven years. He must be deterred. A sentence of 240 months will provide such deterrence.

Further, a lengthy sentence will protect the public. In 2023, St. Louis County, Minnesota was ranked as the third highest county in Minnesota for drug overdose deaths[1]. The only two counties that were higher were Hennepin and Ramsey; counties that have more than double the population of St. Louis County[2]. The Defendant's sale and possession of 836 grams of fentanyl and 7,321 grams of methamphetamine provided thousands of doses of these deadly substances to the residents of Duluth and surrounding communities.

Here, a significant sentence will protect the public from the Defendant, at least for the length of his incarceration and supervision. It will also send a message to the public that the system is working to protect citizens from drug trafficking organization who prey on the vulnerable people in our communities.

---

[1] Minnesota Department of Health, https://www.health.state.mn.us/communities/opioids/documents/countytotals.pdf

[2] The population of St. Louis County, Minnesota in 2023 was 200,514, versus Hennepin County with a population of 1,258,713 and Ramsey County with a population of 536,075. https://www.census.gov

13

**7.     SUPERVISED RELEASE.**

The government requests a maximum supervised release term of 5 years, pursuant to U.S.S.G. § 841(b)(1)(A).

**VI.     CONCLUSION**

For the foregoing reasons, the United States respectfully recommends that the Court sentence the defendant to 240 months' imprisonment. Such a sentence is sufficient, but not greater than necessary, to serve the factors set forth in 18 U.S.C. § 3553(a).

Dated: February 5, 2025

                                                  Respectfully Submitted,

                                                  LISA D. KIRKPATRICK
                                                  Acting United States Attorney

                                                  *s/ Nichole J. Carter*

                                     BY:  NICHOLE J. CARTER
                                                  Assistant U.S. Attorney
                                                  Attorney ID No. 0310141